1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## SOUTHERN DISTRICT OF CALIFORNIA

8
9

MIDLAND NATIONAL LIFE INSURANCE COMPANY,

CASE NO. 11-CV-279-LAB-BGS

10

Plaintiff,

**ORDER RE SUMMARY JUDGMENT MOTIONS**

11

vs.

12
13
14
15
16

RICHARD CARLISLE JOHNSON; ROBERT L. SADIFER; MICHAEL E. BARNHILL; FOUNDATION INSURANCE RESOURCES, LLC; DESERT CHARITABLE FUNDING, INC.; FOLI, INC.; RAYMOND GARRA II; AND KATHERINE SHAYLER,

Defendants.

17
18

The Court recently granted the individual Defendants' motion for a determination that

19

their settlement with Midland was reached in good faith.  It granted this motion over Garra's

20

objection, and as a result this case is now between Midland and Garra only.  Still pending,

21

then, are two motions for summary judgment: Garra's motion for summary judgment as to

22

Midland's claims against him, and Midland's motion for summary judgment as to Garra's

23

counterclaims.  This Order rules on those motions.

24

**I.      Legal Standard**

25

Summary judgment is appropriate where "there is no genuine issue as to any material

26

fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

27

The burden of argument is on the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

28

(1986).

1   The Court considers the record as a whole and draws all reasonable inferences in the

2   light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212

3   F.3d 528, 531 (9th Cir. 2000). It may not make credibility determinations or weigh conflicting

4   evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court

5   determines whether the record "presents a sufficient disagreement to require submission to

6   a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at

7   251–52. Not all alleged factual disputes will serve to forestall summary judgment; they must

8   be both material and genuine. *Id.* at 247–49. "If conflicting inferences may be drawn from

9   the facts, the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947, 959

10  (9th Cir. 2000) (citations omitted).

11  **II.   Garra's Motion for Summary Judgment**

12  Garra only faces two claims—Midland's second claim for fraud and its eleventh claim

13  for restitution and disgorgement based on mistake and unjust enrichment. Garra believes

14  he is entitled to summary judgment on both of them.

15  **A.   Midland's Fraud Claim**

16  One would think  Midland's fraud claim against Garra has to do with Garra filing a

17  claim for benefits under Fletcher's policy when he allegedly knew that Midland was trying to

18  rescind that policy. Midland now says that's not quite right. The fraud claim, actually,

19  "asserts that Garra and his co-defendants acted in concert to fraudulently induce Midland

20  National to issue the Fletcher policy." (Doc. No. 117 at 14.)

21  There's virtually no support for that statement, however, in Midland's second

22  amended complaint. It's true that when the complaint identifies Garra, it says that his

23  "receipt of [Fletcher's] death benefit proceeds is the subject of the Eleventh Claim for Relief,"

24  which certainly suggests  that Garra's receipt of benefits from Fletcher's policy is *not* the

25  subject of Midland's fraud claim. (SAC ¶ 9.) At the same time, nowhere in the complaint

26  does Midland expressly implicate Garra in the issuance of Fletcher's policy. That allegation

27  comes—apparently out of nowhere—later in Midland's briefing. For example, in Midland's

28  motion for summary judgment as to Garra's counterclaims, it says, "After he had submitted

1  his own fraudulent application, Garra convinced his life partner, Carolyn Fletcher, to submit

2  an application of her own." (Doc. No. 116-1 at 2.) That allegation appears nowhere in

3  Midland's complaint, and even the paragraphs Midland cites to in its opposition to Garra's

4  summary judgment motion don't contain it. (*See* Doc. No. 117 at 14–15 (citing SAC ¶¶

5  1–38, 44–49, 9, 38, 79).)

6      In fact, when the complaint discusses the issuance of the policies at issue in this

7  case, it does so under the heading "Johnson, Sandifer and Barnhill Fraudulently Induce

8  Midland National to Issue Life Insurance Policies"—with no mention of Garra at all. (SAC

9  ¶¶ 21–26.) The fraud claim is asserted against "All Defendants," which does include Garra,

10  but by its text it's clearly aimed at the Defendants other than Garra who have already settled

11  with Midland:

12         The defendants' fraud has caused harm to Midland National and
       has unjustly enriched the defendants, entitling Midland National

13         to an order for the disgorgement of all commissions, bonuses,
       and other compensation received by the defendants or received

14         by other persons or entities as a result of the defendants'
       conduct to be turned over by the defendants to Midland

15         National, and in addition to such disgorgement, the award of
       compensatory damages in an amount necessary to redress the

16         harm caused by the defendants' fraud, including without
       limitation the $887,221.11 released to Garra. (SAC ¶ 47.)

17

18  Garra may have received the $887,221.11 payout from Fletcher's policy, but there is no

19  allegation that he also received a commission, bonus, or other compensation from Midland

20  for encouraging Fletcher to apply for a policy. Read closely, then, the Court simply doesn't

21  accept that Midland's second claim for fraud is truly directed at Garra. It may be, as Midland

22  argues, that it has "submitted evidence . . . demonstrating Garra's complicity and

23  participation in the fraudulent inducement of the issuance of the Fletcher policy," but that

24  doesn't mean that, in the first instance, it has properly and explicitly alleged a fraud claim

25  against Garra on the theory that he persuaded Fletcher to apply for a life insurance policy.

26  (Doc. No. 117 at 15.)

27      Midland says its fraud claim is also based on "Garra's fraudulent concealment during

28  the process of submitting the death benefits claim." (Doc. No. 117 at 15.) That begs the

question why, when Garra is identified as a Defendant in Midland's complaint, Midland says "[t]he circumstances surrounding Garra's receipt of [Fletcher's] death benefit proceeds is the subject of the Eleventh Claim for Relief of this complaint." (SAC ¶ 9.)  The clear message there is that Midland's fraud claim is *not* based on Garra's conduct during the time he was pursuing benefits under Fletcher's policy and Midland was trying to rescind that policy.

In the big picture, it's not clear why Midland is so intent on pursuing a fraud claim against Garra, anyway.  Its opposition brief explains that "Midland National agreed to limit its common law fraud claim against Garra to the recovery of the losses associated with the Fletcher policy," but those losses are well covered by its eleventh claim for restitution and disgorgement. (Doc. No. 117 at 15.)  Even the Defendants recent motion for determination of a good faith settlement explained that "the only damages sought against Garra are for the $887,221.11 death benefits that Midland released to Garra on May 11, 2011." (Doc. No. 147-1 at 7.)  Also, in its opposition brief Midland labels its fraud claim against Garra an "alternative claim" and devotes comparatively little argument to defending it.

For all of the above reasons, the Court finds that Midland's fraud claim against Garra is inadequately pled, and at this point in the litigation is a legal distraction that's simply not relevant to the core dispute between Midland and Garra.  Garra's motion for summary judgment as to the claim is therefore **GRANTED**.

### B.    Midland's Restitution and Disgorgement Claim

While there is some disagreement about the specific facts of this case, both parties more or less concede that Midland's payment of benefits to Garra under Fletcher's policy was, from Midland's perspective, a mistake.  The claims analysts who processed Garra's claim for benefits under Fletcher's policy simply didn't get the message that Midland was attempting to rescind that policy, and if they had Midland would have never paid out benefits to Garra.  Garra calls it a "corporate blunder"; Midland calls it "a result of miscommunication within the Midland National organization." (Doc. No. 108-1 at 1; Doc. No. 117 at 1.)  The question now is whether that's reason enough to block Midland's eleventh claim for restitution and disgorgement claim from even going to trial.

1    Garra makes two arguments for the summary dismissal of the claim.  The first, to put

2    it simply, is that there can't be a "mistake of fact" when certain officers at Midland knew it

3    was attempting to rescind the Fletcher policy.  "The knowledge of Midland's high-ranking

4    officers is imputed to the corporation," Garra argues, "and what Midland's claims analyst did

5    not know is legally irrelevant." (Doc. No. 108-1 at 12.)  The second is a general appeal to

6    equity, on the ground that "Midland's own neglect allowed the release of the death benefits

7    to Garra." (Doc. No. 108-1 at 13.)  What Garra *doesn't* seem to argue is that Midland's

8    account of its own mistake is phony, and that it had no basis for rescinding the Fletcher

9    policy.  Garra appears to accept that Midland's payment to him was a mistake and simply

10   takes the position that that's too bad for Midland.[1]

11   Both arguments are stated rather generally and not backed by much legal authority.

12   For the first argument, Garra cites *Am. Oil Serv. v. Hope Oil Co.*, 194 Cal.App.2d 581 (Cal.

13   Ct. App. 1961), and *Clarendon Nat'l Ins. Co. v. Ins. Co. of the West*, 442 F.Supp.2d 914

14   (E.D. Cal. 2006).  For the second argument, he cites *Kulchar v. Kulchar*, 1 Cal.3d 467, 473

15   (1969), and *Wilson v. Wilson*, 55 Cal.App.2d 421, 427 (1942).  He also cites  a treatise on

16   affirmative defenses stating "Circumstances created by the party's own willfulness or lack

17   of reasonable care will not constitute a mistake."  2 Cal. Affirmative Def. § 40:4 (2d ed.).

18   These authorities do not do the work that Garra needs them to.

19   //

20   _____

21   [1] The Court points this out because Garra's account of the facts does lay the
     foundation for an argument that Midland's alleged mistake wasn't an honest one.  He claims
22   that Midland knew, from the outset, that the actual policy holders wouldn't be the ones
     paying their premiums.  (Doc. No. 108-1 at 2 ("Aware that a third party may be responsible
23   for paying the premiums on Johnson's proposed charitable life insurance policies, Midland
     nevertheless welcomed Johnson as an agent for Midland . . . .).)  He claims that Midland
     began investigating the policies purchased through the Defendants as early as December
24   2008.  (Doc. No. 108-1 at 2.)  He claims that "[o]n May 12, 2010, after having been warned
     to flag and watch Johnson's business closely, Midland's Underwriting Department
25   determined that there were no material issues upon which to deny Fletcher's application and
     a policy was issued."  (Doc. No. 108-1 at 3.)  He claims that a high-ranking manager of
26   underwriting, Roger Hofer, who expressed concern about Defendants' policies in 2008 and
     ordered that they be flagged, personally reviewed Fletcher's policy over two years later
27   before the payment was made to Garra. (Doc. No. 108-1 at 6.)  This story is very different
     from the one Midland tells, which is that Defendants induced it—really, *duped* it—to issue
28   life insurance policies it never would have by misrepresenting certain critical facts on their
     applications.  (*See* Doc. No. 167 at 2.)

### 1.    The Imputed Knowledge Argument

Garra's first argument is that, as a matter of law, Midland officials' concern about Fletcher's policy and intention to rescind it must be attributed to the lower-ranking analysts who processed a claim under the policy. If that's true, then obviously Midland can't say that the $887,221.11 payment to Garra was a mistake.

Garra's authority is lacking. His only direct citation is to *Clarendon Nat'l Ins. Co. v. Ins. Co. of the West*, which recognizes that an insurance agent's knowledge may be imputed to the insured in certain circumstances. 442 F.Supp.2d at 936. But that is not controversial, because they are an agent and principal, respectively, and "are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." *Id.*

That is not this case. The analysts processing Garra's claim under Fletcher's policy weren't agents (or principals) of the Midland officials pursuing the rescission of the policy, but simply separate organizational actors—employees, basically—who never received a critical message. At least, Garra doesn't argue that some sort of agency relationship existed between them, and it's hard to see how that argument would go considering that "a servant or employee works for the employer, while an agent also acts for and in the place of the principal for the purpose of bringing the principal into legal relations with third persons." 3 Witkin, Summary of Cal. Law, Agency, § 4, p. 42. *See also Gipson v. David Realty Co.*, 215 Cal.App.2d 190, 205 (Cal. Ct. App. 1963) ("Accordingly, while both a servant and an agent are workers for another under an express or implied employment, an agent works not only *for*, but *in the place of*, his principal.").

Garra cites additional cases in his reply brief, all of which confirm the unremarkable point that in certain circumstances knowledge will be imputed between a high-ranking corporate officer and a corporation, or between a principal and an agent. But none is particular enough to the facts of this case and a claim for restitution based on a genuine mistake of fact where there is a simple failure of certain corporate officials to communicate with lower-ranking employees. (*See* Doc. No. 121 at 5–6.) Imputing the knowledge of one

party to another simply because, generally speaking, they stand in some employee-employer relationship overlooks that "most mistakes of fact occur through failure to resort to means of knowledge." *Am. Oil,* 194 Cal.App.2d at 587.   Indeed, the court in *American Oil* acknowledged "the familiar rule that a payment voluntarily made with knowledge of the facts affords no ground for an action to recover it back," which Garra relies on, but it continued on to acknowledge that "an excessive payment made in ignorance of the fact that it is excessive is recoverable." *Id.* at 586.  Absent any authority that the knowledge of Midland officials may necessarily be imputed to the claims analysts, *American Oil* cuts more in Midland's favor than Garra's.  Garra's theory of imputed knowledge here would override almost the entire law of mistake.  Any time knowledge from the higher ranks of a company fails to trickle down and a payment is made that otherwise wouldn't have been, it would be a windfall for the recipient.  Finally, even assuming some agency relationship can be said to have existed between the Midland officials and the claims analysts, that's ordinarily a question of fact and therefore a triable issue. *Newton v. Am. Debt. Servs., Inc.*, 2013 WL 5592620 at *12 (N.D. Cal. Oct. 10, 2013). *See also Vallely Invs., L.P. v. BancAmerica Commercial Corp.*, 88 Cal.App. 4th 816, 827 (Cal. Ct. App. 2001) (listing indicia of an agency relationship).

The Court finds that Garra has no compelling authority for the argument that "[t]he knowledge of Midland's high-ranking officers is imputed to the corporation." (Doc. No. 108-1 at 16.)  At best, this presents a triable issue of material fact and therefore isn't a basis for summary judgment. *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) ("[U]nless only one conclusion may be drawn, existence of any agency and the extent of an agent's authority is a question of fact and should not be decided on summary judgment.").

### 2.   The Equity Argument

Garra's argument that general equitable principles entitle him to summary judgment also comes up short. *Kulchar* has very little to do with the facts or legal issues of this case, and Wilson dealt with relief from a final judgment in a divorce case, on grounds of mistake. Neither case is particularly helpful here.  The treatise on affirmative defenses, whatever is

to be made of its statement, cites a case holding almost the opposite: "It is now settled . . . that money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund." *Sun 'n Sand, Inc. v. United California Bank*, 21 Cal.3d 671, 700 (1978) (quoting *Nat'l Bank of California v. Miner*, 167 Cal. 532, 537 (1914)).   *Sun 'n Sand* considered the statutory definition of mistake under California law:

> Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in:
>
> 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or,
>
> 2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed.  Cal. Civ. Code § 1577.

It then recognized previous holdings that "ordinary negligence does not constitute the neglect of a legal duty as that term is used in section 1577." *Id.* at 700–01 (quotations and citation omitted).  Indeed, the "neglect of a legal duty qualification," the court explained, "derives content from equitable considerations and principles . . . that it would be inequitable to bar relief for mistake because of the breach of a duty of care when the party from whom recovery is sought suffers no loss." *Id.* at 701.  *Sun 'n Sand* is decidedly in Midland's favor here, and compels the conclusion that even if it was negligent or neglectful in releasing benefits to Garra, it isn't foreclosed from asserting that it was mistaken and attempting to recover its money.

The Court finds no authority for the propositions Garra urges, namely that Midland's own neglect is responsible for its loss and forecloses any kind of restitution and disgorgement claim.  If those principles had the kind of traction Garra believes they do, there would be almost no law of mistake to speak of.  As the court in *American Oil* noted, almost all mistakes involves some kind of failure on the part of the mistaken party.  Garra's rebuttal that the mere voluntariness of Midland's payment precludes recovery simply begs the

question whether it was truly voluntary, and made with total knowledge of all relevant facts. (*See* Reply Br. at 1.)

The analysis changes slightly with *City of Hope Nat'l Med. Ctr. v. Superior Court*, 8 Cal.App.4th 633 (Cal. Ct. App. 1992), which Midland cites in its opposition brief and Garra cites in his reply. Whereas the above-cited cases ostensibly dealt with a mistaken payment from one party to a contract to another, *Hope Nat'l* deals with a mistaken payment to a third party, which is arguably more in line with the facts of this case. City of Hope National Medical Center provided medical treatment to an individual, and then billed and was paid by his insurer. The insurer later realized that the treatment was experimental and not covered under the individual's policy, and sought a refund from the Medical Center. The court's analysis began with a principle that's familiar from the cases already cited here: "As a general rule, equitable concepts of unjust enrichment dictate that when a payment is made based upon a mistake of fact, the payor is entitled to restitution unless the payee has, in reliance on the payment, materially changed its position." *Id.* at 636–37. *Sun 'n Sand* held essentially the same thing. 21 Cal.3d at 700. But *Hope Nat'l* added another qualifier where third parties are involved: "Restitution will be denied, however, if the mistaken payment is made to a bona fide creditor of a third person—a creditor without fault because it made no representations to the payor and because it had no notice of the payor's mistake at the time the payment was made." *Hope Nat'l*, 8 Cal.App. 4th at 637.

Even *Hope Nat'l*, however, doesn't do what Garra needs it to, and that's because there's a substantial dispute in this case as to whether Garra himself knew Midland was attempting to rescind Fletcher's policy and made various misrepresentations in pursuing benefits under the policy. Garra says "Midland has proffered no evidence whatsoever establishing that Garra fraudulently obtained the death benefits," and that is simply false. (Doc. No. 121 at 4.) Midland alleges that it sent three letters to Fletcher pertaining to the rescission of her policy that Garra must have received and read *before* he received and deposited a check from Midland. (SAC ¶¶ 31, 33, 34, 35.) It alleges that he was silent during a conference call during which the rescission of Fletcher's policy came up even *after*

he received and deposited the check. (Doc. No. 116-1 at 10.) It alleges that Garra received a letter addressed *to him* in which Fletcher's name was listed as the owner of a problematic life insurance policy. (SAC ¶ 33.) It alleges that Garra consulted with the other Defendants about pursuing benefits under Fletcher's policy when they must have known of Midland's intent to rescind her policy. (Doc. No. 117 at 13.) Garra disputes all of this, of course, and that's fine, but it's plain wrong to assert that there's not even a triable question of fact as to whether Garra himself was aware that Midland was attempting to rescind the Fletcher policy and made certain misrepresentations to Midland.

For all of the above reasons, Garra's motion for summary judgment as to Midland's restitution claim is **DENIED**. If the Court treats this case like *Sun 'n Sand*, there is a triable question as to whether Garra has detrimentally relied on the $887,221.11 payment. If it treats this case more like *Hope Nat'l*, there is a triable question as to Garra's own fault and responsibility for receiving the payment when Midland was simultaneously trying to rescind the policy under which it was made. Midland plausibly alleges that the payment to Garra was a mistake, and the Court sees no basis here for summary judgment in Garra's favor.

### C. Conclusion

Garra's motion for summary judgment as to Midland's fraud claim is **GRANTED**. His motion for summary judgment as to Midland's restitution and disgorgement claim based on mistake and unjust enrichment is **DENIED**.

## III. Midland's Motion for Summary Judgment

Garra answered Midland's second amended complaint and asserted three counterclaims: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) financial abuse of an elder. These counterclaims are in some sense unnecessary because they mostly just repackage his defenses to Midland's restitution claim. Garra already has the $887,221.11 that Midland wants back, and if Midland doesn't prevail on its restitution claim Garra will get to keep it. On the other hand, that isn't all that Garra wants. He seeks the fees and costs of defending this lawsuit, as well as punitive damages and damages for mental and emotional distress, and it may be that he needs these

1  additional claims to that end.  In any event, Midland tackles the claims on their merits, and

2  so will the Court.

3         The factual allegations behind Garra's counterclaims are very straightforward.

4  Midland issued Fletcher a life insurance policy, Garra was appointed the beneficiary of it,

5  Garra filed a claim for benefits when Fletcher died, the claim was thoroughly investigated

6  and paid, and before too long Midland named Garra in a lawsuit to recover the payment that

7  he labels "groundless, frivolous, malicious, oppressive, and abusive."  (Doc. No. 96 at 21.)

8         **A.     Garra's Breach of Contract Claim**

9         Garra alleges that Midland breached Fletcher's policy contract by "claiming

10 entitlement to the policy benefit amount already paid; unreasonably demanding the return

11 of policy benefits from Garra; unreasonably filing suit against Garra; and unreasonably

12 violating Garra's right to quiet enjoyment and possession of the policy benefits."  (Doc. No.

13 96 at 22.)

14        The Court agrees with Midland that Garra's breach of contract claim is inartfully pled.

15 Taking Garra at his word, he seems to be arguing that merely by claiming the $887,221.11

16 payment was a mistake and resorting to litigation to recover it, Midland is breaching the

17 terms of Fletcher's policy.  That can't be right.  There is no allegation from Garra that

18 Midland ever waived its right to ever assert mistake, or to resort to litigation to recover an

19 allegedly mistaken payment.  In fact, if Midland sincerely believes it made a mistake in

20 paying benefits to Garra, it has every right to do those things.  *Hope Nat'l*, 8 Cal.App.4th at

21 636–37; *Sun 'n Sand*, 21 Cal.3d at 700.  *See also Burckard v. Smith*, 80 Cal.App. 104, 107

22 (Cal. Ct. App. 1926).

23        Of course, it may be arguable that there was no mistake on Midland's part, or that it

24 must suffer the consequences of that mistake, or that the equities have shifted following the

25 mistake in Garra's favor.  But those are simply arguments against Midland's restitution and

26 disgorgement claim; they aren't the basis of an independent, breach of contract counterclaim

27 for Garra.  Midland even concedes that it bears the burden of proof "to establish (1) that

28 Fletcher's policy was properly subject to rescission, and (2) that Midland National

nonetheless paid the death benefits to Garra in error and based on a mistake of fact, here, the claims personnel's ignorance of the fact that a lawsuit had been filed to rescind the Fletcher policy." (Doc. No. 116-1 at 12.)  Again, Garra has arguments and evidence that cut against both of those things, but they are not themselves the basis of a breach of contract claim.

The Court finds Garra's opposition to Midland's summary judgment motion somewhat perplexing.  It focuses more on Midland's affirmative defense of fraud to Garra's breach of contract claim, less on sharpening the claim in the first place to respond to Midland's legitimate argument that it is basically being counter-sued for the mere act of taking Garra to court.  Indeed, Garra repeats that Midland breached the Fletcher policy "by claiming entitlement to the death benefits it already paid, demanding the return of said death benefits from Garra, filing suit against Garra, and violating Garra's right to quiet enjoyment and possession of the policy benefits."  (Doc. No. 129 at 8.)  Garra does say that "[w]here the insurer pays, and later demands the return of, policy benefits, it is no different than refusing to pay benefits entirely."  (Doc. No. 129 at 9.)  That's getting somewhere, but Garra then cites an insurance case that, as the Court reads it, seems to involve a live dispute about benefits being owed, retrospectively and prospectively, and a lawsuit brought by the insured to obtain them.  *See Fletcher v. Western Nat'l Life Ins. Co.*, 10 Cal.App.3d 376 (Cal. Ct. App. 1970).  This case is different.  Fletcher's policy, assuming it was legitimate, apparently entitled Garra to a one-time payment of $887,221.11.  That money is now his, and Midland, taking the offensive, has had to bring a lawsuit to recover it.  The posture of this case certainly allows for Garra to raise various defenses to returning the money, but it is almost unintelligible to claim that Midland has breached a contract just by filing a lawsuit to recover what it believes is rightfully its money.

Garra really presses the argument that Midland has no basis for rescinding the Fletcher policy, which, again, is a fine argument to make but has far more to do with defending against Midland's rescission claim than it does pursuing a breach of contract claim of its own. (Doc. No. 129 at 10–12.)  As the Court has noted, Midland concedes that in order

1    to prevail it must show that it is justified in attempting to rescind the Fletcher policy.  For

2    these reasons, Midland's motion for summary judgment as to Garra's breach of contract

3    claim is **GRANTED**.

### B.    Garra's Bad Faith Claim

5          An insurer owes a duty of good faith and fair dealing to its insureds.  *Lehto v. Allstate*

6    *Ins. Co.*, 31 Cal.App.4th 60, 72 (Cal. Ct. App. 1994).   This extends to any express

7    beneficiary of the insurance policy.  *Jones v. Aetna Cas. & Sur. Co.*, 26 Cal.App.4th 1717,

8    1724 (Cal. Ct. App. 1994).  "The elements of a claim for tortious insurance bad faith are that

9    benefits due under the policy were withheld and that the withholding was unreasonable."

10   *Gentry v. State Farm Mut. Auto Ins. Co.*, 726 F.Supp.2d 1160, 1166 (E.D. Cal. 2010).

11         Garra's bad faith claims sounds a lot like its breach of contract claim.  He accuses

12   Midland of unreasonably demanding a return of the benefits it paid to Garra, of pursuing a

13   groundless lawsuit, and of failing to reasonably investigate Garra's claim for benefits in the

14   first instance.  (Doc. No. 96 at 22–23; Doc. No. 129 at 13.)  And as with Garra's breach of

15   contract claim, the factual bases of Garra's bad faith claim are essentially identical to his

16   bases for defending against Midland's restitution claim that's at the heart of this case.

17         Garra is certainly right that "[w]here an insurer threatens or attempts to rescind a

18   policy where there are no valid grounds to do so, this is a breach of the Implied Covenant

19   of Good Faith and Fair Dealing in and of itself."  (Doc. No. 129 at 14.)  Midland's instinct is

20   to actually justify its attempted rescission of the Fletcher policy, but that's more argument

21   than it needs.  (Doc. No. 116-1 at 16–17.)  That's because even if Midland is ultimately in

22   the wrong in this case, so long as there's a good faith dispute as to its position Garra's bad

23   faith claim fails.  All Midland needs to show to is that there's a good faith dispute in this case,

24   and it has shown that.  *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*,

25   90 Cal.App.4th 335, 347 (Cal. Ct. App. 2001) ("It is now settled law in California that an

26   insurer denying or delaying the payment of policy benefits due to the existence of a genuine

27   dispute with its insured as to the existence of coverage liability or the amount of the insured's

28   / /

1   coverage claim is not liable in bad faith even though it might be liable for breach of

2   contract.").

3           Just as important, this issue can be adjudicated on summary judgment, as it was in

4   *Chateau Chamberay*.  The Court, looking at the arguments and evidence before it, can make

5   a determination that the dispute in this case is genuine, rather than needlessly orchestrated

6   by Midland simply to be litigious and burden Garra.  "If a genuine dispute as to coverage

7   existed at the time benefits were denied, then the court may conclude as a matter of law that

8   the insurer did not act unreasonably."  *Alethia Research and Mgmt., Inc. v. Houston Cas.*

9   *Co.*, 831 F.Supp.2d 1210, 1222 (C.D. Cal. 2011).  The Court reaches that conclusion here.

10  There is certainly evidence in this case that Midland was institutionally disorganized during

11  the processing of Garra's claim for benefits under Fletcher's policy, but there is no evidence

12  that it never investigated Garra's claim thoroughly.  In fact, quite the opposite appears to be

13  the case.  By Garra's own admission Midland investigated his claim rigorously before paying

14  out the benefits.  (Doc. No. 129 at 5–6.)  His counterclaims allege that "[f]ollowing an

15  extensive, approximate two-month claims investigation, Midland issued the insurance

16  policy's death benefits to Garra."  (Doc. No. 96 at 21.)  There are also no allegations from

17  Garra that Midland has engaged in deceptive practices or used improper standards to

18  demand the return of its $887,221.11.

19          Looking at the arguments and evidence in this case, the Court finds that Midland has

20  a good faith belief that the Fletcher policy is subject to rescission, and that it was only by

21  mistake—a failure to communicate within the Midland organization—that it paid benefits to

22  Garra under Fletcher's policy.  It did, after all, successfully rescind all other policies obtained

23  by Defendants, and there's no doubt that had there been better communication internally

24  Midland would have never paid out benefits to Garra.  Summary judgment is therefore

25  appropriate on Garra's bad faith claim.  Midland's motion for summary judgment as to the

26  claim is **GRANTED**.  *See Esparza v. Burlington Ins. Co.*, 866 F.Supp.2d 1185, 1206–07

27  (E.D. Cal. 2011).

28  / /

### C.    Garra's Elder Abuse Claim

Garra's last counterclaim is for financial abuse against an elder, in violation of California's Welfare and Institutions Code § 15610.30.  The statute defines "financial abuse" in three different ways:

> (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

> (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

> (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70.  Cal. Welf. & Inst. Code § 15610.30(a).

With respect to subsections (1) and (2), "[a] person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity should have known that this conduct is likely to be harmful to the elder or dependent adult."  *Id.* at § 15610.30(b).  It also defines taking, secreting, appropriating, obtaining, and retaining real or personal property as "depriv[ing]" the elderly of any property right.  *Id.* at § 15610.30(c).  With respect to subsection (3), section 15610.70 defines undue influence as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity."  Cal. Welf. & Inst. Code § 15610.70.  Courts are to consider the vulnerability of the victim, the influencer's apparent authority, and the actions or tactics used by the influencer.  *Id.*

Garra's conuterclaim is stated rather conclusively.  It doesn't even identify which subsection of § 15610.30 Midland has allegedly violated, and merely says that "Midland's actions against Garra in attempting to effectuate a return of legitimately received policy benefits are acts of financial abuse against an elder."  (Doc. No. 96 at 23.)  The Court presumes that the basis for the claim is quite similar to the basis for Garra's breach of contract claim, which is that by merely pursuing litigation to recover a benefit payment it

believes was mistakenly made, Midland is violating the law.  It also appears that Garra accuses Midland of committing elder abuse, preliminarily, by not protecting Garra from the other Defendants' alleged insurance scheme.  (Doc. No. 129 at 15.)

Because the Court has already determined that there is a genuine dispute in this case as to whether Garra is entitled to keep the $887,222.21 at stake, it is very hard for Garra to maintain that Midland is attempting to retain his property "for a wrongful use or with intent to defraud."  Likewise, it is very hard to argue that when a party pursues litigation to retain what it genuinely believes to be its rightful property, it is somehow exerting undue influence. As Midland says, the Elder Abuse Act "was designed to protect elderly and dependent persons from abuse, neglect, or abandonment."  *Mack v. Soung*, 80 Cal.App.4th 966, 971 (Cal. Ct. App. 2000).  Abuse, neglect, and abandonment refer to categorically different classes of behavior from Midland's pursuit of litigation to recover an insurance payment that it genuinely believes was an honest, albeit embarrassing, mistake.  The Court simply finds no evidence that Midland's method of recovering the insurance payment it made to Garra rises to the level of elder abuse, as defined by the statute.

In his opposition brief Garra clarifies his elder abuse claim somewhat.  He says "[a] violation of the statute occurs if, among other things, the person or entity (1) 'takes, secretes, appropriates, obtains, or retains [the property],' and that person or entity (2)(b) 'knew or should have known that this conduct is likely to be harmful to the elder or dependent adult.'" (Doc. No. 129 at 15.)   This just ignores the question whether Midland can be said to have taken, secreted, obtained, or retained" the $887,221.11 payment under § 15610.30(c). There's no doubt that, on some level, Garra will be harmed by returning $887,221.11 he thought was his, but the mere fact of harm can't possibly be the full legal standard.  Garra must also allege and show that Midland has deprived him of a property right, and he can't do that.  All Midland has done is file a lawsuit to recover money that it believes it mistakenly paid to Garra.  Given the Court's earlier finding that there is a genuine dispute in this case, there is no basis for the charge that Midland has committed elder abuse, as it is defined by § 15610.30.  If Garra is, eventually, deprived of the money, it won't be Midland's doing as

- 16 -

1  much as the trier of fact's in a court of law.  Midland's motion for summary judgment as to

2  Garra's claim for elder abuse is **GRANTED**.

3          **D.    Conclusion**

4          None of Garra's three counterclaims survive Midland's motion for summary judgment.

5   That motion is therefore **GRANTED IN ITS ENTIRETY**.

6  **IV.    Conclusion**

7          This is a simpler case than the parties seem willing to make it.  Midland cut Garra a

8  benefits check for $887,221.11, which Garra deposited and presumably still has.  Midland

9  now says it made a mistake.  At the time it was processing Garra's claim for benefits, it was

10  attempting to rescind the very policy under which the benefits were claimed.  Had it been

11  more organized and aware, it would have never paid Garra.  Now it wants its money back.

12          That claim raises just a few questions.  The first is whether Midland has a legitimate

13  basis for rescinding the Fletcher policy.  The second is whether the payment to Garra was

14  truly an honest mistake.  The third is whether the equities in this case are such that even if

15  Midland prevails on the first two questions, there's still some reason to let Garra keep the

16  money.  Perhaps he has so changed his position after receiving it that it'd be unjust to

17  require him to return it, or perhaps he can show that he is an innocent bystander in all of this

18  and has himself done nothing wrong.[2]  On each of these questions, Midland and Garra each

19  have arguments and evidence that cut in their favor.

20          But, critically, all of these questions are encompassed and exhausted by a single

21  claim—Midland's original claim for restitution and disgorgement based on mistake and unjust

22  enrichment.  For the reasons the Court has given, Midland really doesn't plead a fraud claim

23  against Garra.  Likewise, there is no meaningful basis for Garra's counterclaims.  Merely

24  pursuing litigation to recover money can't itself be a breach of contract, and given the Court's

25  finding that there is a genuine dispute here, it's not possible for Garra to accuse Midland of

26  _____

27  [2] It will likely have to be one of these or the other, depending on whether the Court treats this case like *Sun 'n Sand* or *Hope Nat'l*.  There isn't focused argument from the parties on this point, but it can certainly be resolved as a motion in limine leading into trial.

28  The Court's best sense is that *Hope Nat'l* will control because Garra is effectively a third party beneficiary of Midland's life insurance contract with Fletcher.

bad faith or elder abuse.  Garra's counterclaims are simply vessels for the very arguments and evidence it will offer to defend against Midland's restitution claims, and by themselves offer nothing independent and unique.

Garra's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  Midland's motion for summary judgment as to Garra's counterclaims is **GRANTED**. Midland's motion to strike the Blakeman report, which pertains to Garra's bad faith claim, is **DENIED AS MOOT**.  With the Court's recent ruling on Defendants' motion for determination of a good faith settlement, and this Order, this case is now ready to proceed to trial.  By no later than April 2, 2014, the parties shall contact the chambers of Magistrate Judge Skomal to schedule a settlement conference.  If the case fails to settle, Judge Skomal shall promptly schedule a pretrial conference, at which time a trial date will be set.

**IT IS SO ORDERED**.

DATED:  March 24, 2014

**HONORABLE LARRY ALAN BURNS**
United States District Judge